[Cite as *State v. Speicher*, 2020-Ohio-3845.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
UNION COUNTY


STATE OF OHIO,

    PLAINTIFF-APPELLEE,                    CASE NO.  14-13-17

    v.

VICTOR L. SPEICHER,                       O P I N I O N

    DEFENDANT-APPELLANT.


Appeal from Union County Common Pleas Court
Trial Court No. 2012-CR-0028

Judgment Affirmed

Date of Decision:   July 27, 2020


APPEARANCES:

    *J. C. Ratliff* for Appellant

    *Samantha M. Hobbs* for Appellee

**SHAW, P.J.**

{¶1} Defendant-appellant, Victor Speicher ("Speicher"), brings this appeal from the July 23, 2013 judgment of the Union County Common Pleas Court sentencing him to serve life in prison without parole after he was convicted by a jury of Rape of child under the age of ten in violation of R.C. 2907.02(A)(1)(b), and Gross Sexual Imposition in violation of R.C. 2907.05(A)(4). On appeal, Speicher argues that the trial court erred by failing to grant his motion to suppress the statement made by the child-victim, R.B., to a medical forensic interviewer, that the trial court erred by allowing the interview of R.B. to be played for the jury, that the trial court erred by finding R.B. competent to testify by video deposition, and that Speicher received ineffective assistance of counsel.

*Background*

{¶2} The victim in this case, R.B., was born in May of 2007. When R.B. was four years old, he was living with his mother, his father, and his siblings. Due to the work schedules of R.B.'s parents, he spent Friday nights at the residence of his maternal grandmother, Virginia, and her husband, Speicher—R.B.'s step-grandfather. By all accounts R.B.'s mother had a close relationship with Virginia and Speicher, having lived with them for a number of years. In addition, prior to the incidents leading to this case, all indications were that R.B. enjoyed going to Virginia and Speicher's residence. R.B. even referred to Speicher as "papaw."

{¶3} A couple of days after a family gathering in late 2011, R.B.'s mother observed R.B. randomly dropping his pants and then "messing with himself * * * it wasn't just touching." (June 4, 2013, Tr. at 57). She clarified that she meant R.B. was masturbating, that he did it multiple times including at least once while another person was present. R.B.'s mother asked him about the masturbation and where he learned it since R.B. was not just touching his privates. R.B. responded that he was trying to see how "big" he could make it and he told his mother that what he was doing was not any of her business because it was a game that he played with "papaw at night at bedtime." (*Id.* at 58-59).

{¶4} R.B.'s mother informed her husband of R.B.'s statements and they decided to take R.B. to the family doctor in the morning. The family doctor referred them to Nationwide Children's Hospital and set up an appointment.

{¶5} R.B. was taken to Nationwide Children's Hospital and interviewed by Kerri Wilkinson, a licensed social worker/medical forensic interviewer. That interview was recorded, there were no police officers present, and the interview was observed by a doctor who would physically examine R.B. During the interview, R.B. was asked why he was brought to the hospital and he said "because [Speicher] would suck my pee[]pee on nights." (State's Ex. 3, p.9). R.B. was asked if that actually happened and R.B. said it did. When asked how it happened, R.B. indicated

a sucking sound with his mouth. He indicated that it felt like it did when his father tickled him.

{¶6} R.B. stated that Speicher removed R.B.'s clothes and sometimes his own clothes. R.B. revealed that Speicher would have R.B. play with Speicher's "peepee." When asked how he did that, R.B. made a stroking motion with his arm and hand. R.B. was asked if his genitalia looked similar to Speicher's and R.B. said Speicher's was bigger.

{¶7} In the interview R.B. was able to identify his "peepee" and his mouth on diagrams. He was also given anatomical dolls to demonstrate what had happened and he first removed the pants on the dolls then showed one doll performing fellatio on the other doll.

{¶8} After the forensic interview, R.B. was examined by Dr. Thackery. The examination did not reveal any injuries to R.B., but Dr. Thackery indicated he would not expect to find any based on what was disclosed. R.B. was then referred to a psychiatric social worker with expertise in child abuse.

{¶9} While in counseling, R.B. disclosed a consistent story as to what happened to him during the first and second sessions; however, after those early sessions, R.B. "shut down" and was less willing to talk. In fact, R.B. even wet himself in the office when talking about the incidents in question. R.B. was diagnosed with PTSD and generalized anxiety.

{¶10} In addition to the issues displayed in counseling, R.B. had also reverted to wetting the bed at home and was acting out more often than he had been previously.

{¶11} Meanwhile, after officers were informed of the allegations R.B. had made, they went to speak with Speicher at his home. Speicher claimed that he did not know anything about the purported accusations. He stated that there was one time where he cleaned some "fuzz" off of the end of R.B.'s penis, and "then there was another incident where [R.B.] had a hair * * * wrapped around it. * * * And he pulled on it so tight that it was turning blue. Of course, that put in his head everything that's happened to him." (State's Ex. 9 at 3).

{¶12} Speicher told the officers that all he had ever done was teach R.B. how to keep himself clean. In addition, he stated he was never around R.B. by himself, that his wife was always in the room. He made claims that R.B.'s father was provoking R.B.'s accusations to get Speicher's house.

{¶13} A grand jury was convened in Speicher's case and Speicher provided, or attempted to provide, testimony. However, Speicher was mostly non-verbal and in a wheelchair at the time. He did provide some testimony through hand gestures indicating that his wife often went to bed before him on Friday nights. Speicher's wife had to wake up around 3:30 a.m. on Saturday mornings to go to work so she often went to bed early. Speicher also again relayed the incident of a hair being

wrapped around R.B.'s penis, but he denied ever performing any fellatio on R.B. Speicher denied ever seeing R.B. masturbate, adding that he did not know why R.B. would lie about the alleged incidents.[1]

{¶14} On February 22, 2012, Speicher was charged with Rape of a person under the age of ten years old in violation of R.C. 2907.02(A)(1)(b), and Gross Sexual Imposition in violation of R.C. 2907.05(A)(4), a felony of the third degree. He entered pleas of not guilty to the charges.

{¶15} On May 3, 2012, Speicher filed a suppression motion seeking to suppress the interview of R.B. that had been conducted at Nationwide Children's Hospital. The State filed a response contending that the statement was non-testimonial in nature as it was made for the purpose of medical diagnosis. In addition, the State argued that there was no indication R.B. would be unavailable as a witness at trial.

{¶16} A suppression hearing was held June 15, 2012. At the hearing, Kerri Wilkinson provided testimony regarding the interview that Speicher was seeking to suppress and the interview itself was introduced into evidence. Regarding the interview, Wilkinson testified that she was a licensed social worker, that she was a medical forensic interviewer, and that she conducted the interview with R.B. for the purpose of medical diagnosis and treatment. She testified that the interview was

---

[1] The detective who investigated the case indicated that around this time he observed Speicher standing outside speaking to a neighbor, despite Speicher's relatively feeble appearance at grand jury.

conducted before R.B. was examined by a physician; however, the physician observed the interview. Wilkinson testified that law enforcement was not present during the interview. In fact, Wilkinson testified she was not aware if law enforcement had been notified at all of the allegations at the time of the interview.

{¶17} On June 25, 2012, the trial court filed an entry denying Speicher's suppression motion. The trial court reasoned the interview was in the course and scope of R.B.'s treatment, which was standard procedure for the hospital, that law enforcement was not involved in any manner, and that the interview was not performed for investigative purposes.

{¶18} On December 12, 2012, the State filed a motion for video-taped deposition of R.B., or in the alternative, to permit testimony by closed circuit television pursuant to R.C. 2945.481. That motion was amended with a request that the deposition be used at trial. The defense did not respond to, or oppose, the motion. Subsequently, the State's motion was granted, and Speicher was permitted to observe R.B.'s deposition via closed-circuit television.

{¶19} R.B.'s deposition was taken on April 8, 2013. The trial court was present for the testimony and began the deposition by asking R.B. about his background, then the trial court questioned R.B. as to whether he could distinguish between truth and lies. Both the prosecutor and defense counsel were also present to question R.B. at the deposition.

{¶20} During R.B.'s direct testimony, he was more reluctant to recount the events with Speicher than in his initial interview with Kerri Wilkinson months prior. R.B. was asked if he remembered "papa" or "papaw" or Speicher, and his initial response was "uh-huh. Bad stuff. Very ugly." (State's Ex. 6 at 11). R.B. testified that bad stuff happened at Speicher's house where he went to bed. When asked to elaborate, R.B. initially said "that's the ugly part." (*Id.*) R.B. was asked again and he said that what he would have to say "won't be nice." (*Id.* at 12). R.B. said he did not want to talk about it.

{¶21} Eventually R.B. opened up and said there were "about" seven nights of bad stuff, though he continued to maintain he did not "want to talk about the peepee stuff." (*Id.* at 14).

{¶22} When asked to identify his "peepee," R.B. identified his penis. He was then asked if anyone touched his "peepee" and he indicated that Speicher had. He testified that Speicher "played with it." (*Id.* at 16). He continued to state that the rest was the ugly part.

{¶23} R.B. did eventually testify that Speicher "sucked" on his peepee. R.B. indicated he did not know what Speicher meant when Speicher had said he was "sucking the juice out of it." (State's Ex. 6 at 18). Later in the deposition R.B. more affirmatively stated that Speicher "sucked" his "peepee," that he was telling the truth, that it really happened, and that he could still remember it. He testified he did

not suck on Speicher's "peepee." R.B. testified that Speicher put his clothes on the floor before the incidents, and that his "mamaw" was in the other room. (*Id*. at 21).

{¶24} On cross-examination R.B. testified he could not remember when the incidents occurred because "it was a very long time ago. * * * But I still remember the peepee stuff because it's very easy to remember." (*Id*. at 26). When asked again later he testified that the incidents must have been several weeks ago because "it was a very long time ago. Weeks is very long, but I don't know which one." (*Id*. at 27).

{¶25} R.B. was asked if he told his mother right after it happened and he stated that she caught him "doing it." (*Id*. at 26). When asked what he was caught doing, he stated, "The peepee. But I wasn't sucking on it. I was just – just bouncing up and down." He clarified that he was found playing with his own "peepee."

{¶26} Before the deposition concluded, the court asked R.B. if he could identify Speicher on a monitor, who was observing the deposition through closed-circuit television. R.B. said he could not identify him, that it kind of looked like Speicher but "I think he had – had – had brown head." (*Id*. at 30).

{¶27} Speicher's case proceeded to a jury trial on June 4-5, 2013. At trial the State presented the testimony of R.B. through his deposition, the testimony of R.B.'s parents, Bradley and Sheila, the testimony of the medical social worker who interviewed R.B. at the hospital, the testimony of the doctor who examined R.B. at

the hospital, the testimony of R.B.'s counselor, and the testimony of the detective who investigated the matter. Various exhibits were introduced into evidence including the interview of R.B. at the hospital, and Speicher's grand jury testimony. In his case-in-chief, Speicher presented the testimony of Rebecca J., R.B.'s aunt, and Speicher's wife Virginia. Ultimately the jury returned guilty verdicts against Speicher on both counts.

{¶28} On July 23, 2013, Speicher was sentenced to serve life in prison without parole on the Rape conviction and he was sentenced to serve a consecutive five-year prison term on the Gross Sexual Imposition conviction. Speicher originally filed a timely notice of appeal with this Court; however, after repeated notifications to his attorney to file a brief, no merit brief was ever filed. Therefore Speicher's appeal was dismissed for want of prosecution. Later, however, Speicher filed a request with this Court to reopen his appeal as though it was on direct appeal due to ineffective assistance of appellate counsel. We granted Speicher's request since his original attorney never filed a brief, and he now proceeds as though on direct appeal, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**The trial court erred when it failed to sustain appellant's motion to suppress.**

**Assignment of Error No. 2**
**The trial court erred to the prejudice of appellant by finding the child victim competent to testify and to testify by video deposition.**

**Assignment of Error No. 3**
**The trial court erred to the prejudice of appellant when it allowed**
**the jury to hear the videotape interview of the child victim.**

**Assignment of Error No. 4**
**Appellant was denied his right to effective assistance of trial**
**counsel.**

{¶29} As the first and third assignments of error are interrelated, we elect to address them together.

*First and Third Assignments of Error*

{¶30} In his first assignment of error Speicher argues that the trial court erred by overruling his motion to suppress the interview of R.B. that was conducted at Nationwide Children's Hospital by Kerri Wilkinson. In his third assignment of error Speicher argues that the trial court then erred by allowing the interview of R.B. to be played at trial.

Standard of Review

{¶31} "Appellate review of a decision on a motion to suppress presents a mixed question of law and fact." *State v. Burnside,* 100 Ohio St.3d 152, 2003–Ohio–5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id.* citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). When reviewing a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at

¶ 8 citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.* citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

Analysis

{¶32} Speicher claims that the trial court erred by denying his motion to suppress the interview with R.B. that had been conducted by Kerri Wilkinson at Nationwide Children's Hospital. He argues that, contrary to the trial court's finding, the interview at Nationwide Children's Hospital was not made for purposes of medical diagnosis and treatment, but rather for forensic and investigative purposes alone.

{¶33} Contrary to Speicher's argument, Kerri Wilkinson provided testimony at the suppression hearing that she was a medical forensic interviewer employed at Nationwide Children's Hospital. She testified that she interviewed R.B. prior to the physician's exam at the hospital; however, the interview was observed by the physician who conducted the physical examination of R.B. In addition, Wilkinson specifically testified that the primary purpose of the interview was for medical treatment and diagnosis. She further testified that law enforcement was not present during the interview or observing the interview. She actually testified she was not even aware if law enforcement had been contacted at the time of the interview.

{¶34} The trial court analyzed the facts presented and legal authority and determined that R.B. was interviewed in the course and scope of his treatment at the hospital, which was the standard procedure for the hospital in similar cases for determining a proper diagnosis. Generally, the Supreme Court of Ohio has held that statements made to medical personnel at a medical facility under circumstances such as those before us are admissible at trial. *See State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482; *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267; *see also State v. Williams*, 1st Dist. Hamilton No. C-140199, 2015-Ohio-3968 (interpreting cases from the Supreme Court of Ohio and holding that statements were nontestimonial and were for purposes of medical diagnosis where they were made at a medical facility for the primary purpose of receiving medical treatment and because they were the kind of statements that would cause a medical professional to be concerned about the possibility of physical injury, psychological trauma, or disease.) There are different situations where a child's statements during an interview would be inadmissible such as statements made at child-advocacy center that serve primarily a forensic or investigative purpose, but that situation is readily distinguishable from the case before us. *See State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742. After reviewing the record and the applicable legal authority, we cannot find that the trial court erred by overruling Speicher's suppression motion. Thus his first assignment of error is overruled.

**{¶35}** Next, Speicher argues that the trial court erred by permitting the recorded interview at Nationwide Children's Hospital between Wilkinson and R.B. to be played at trial, claiming that it was inadmissible hearsay. However, Evid.R. 803(4) contains a hearsay exception, regardless of whether the declarant is available as a witness, for "Statements for Purposes of Medical Diagnosis or Treatment." It reads, "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Under circumstances similar to the case *sub judice* this Court has previously determined that testimony is admissible as an exception to hearsay pursuant to Evid.R. 803(4). *State v. Bender*, 3d Dist. Union No. 14-19-22, 2020-Ohio-722, ¶¶ 8-17. As Speicher has not established that the statements were inadmissible and we cannot find that the trial court erred. Therefore, Speicher's third assignment of error is overruled.

*Second Assignment of Error*

**{¶36}** In his second assignment of error Speicher argues that the trial court erred by finding R.B. competent to testify and by allowing him to testify by video deposition.

Standard of Review

{¶37} Generally we review a trial court's determination finding a child competent to testify under an abuse of discretion standard. *State v. Frazier*, 61 Ohio St.3d 247, 252 (1991). An abuse of discretion implies that a trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). However, where there is no objection to a determination that a child is competent to testify we review the matter under a plain error standard. *See State v. Tebelman*, 3d Dist. Putnam No. 12-19-01, 2010-Ohio-481, ¶ 15. For this Court to notice plain error, the error must be an obvious defect in a trial's proceedings, it must have affected substantial rights, and it must have affected the outcome of the trial. *State v. Steele*, 138 Ohio St.3d 1, 2013-Ohio-2470, ¶ 30, citing *State v. Eafford*, 132 Ohio St.3d 159, 2012-Ohio-2224, ¶ 11, citing *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642; *State v. Lynn*, 129 Ohio St.3d 146, 2011-Ohio-2722, ¶ 13; Crim.R. 52(B). Moreover, "even when the minimum requirements have been met, a reviewing court should still be conservative in its application of plain-error review, reserving notice of plain error for situations involving more than merely theoretical prejudice to substantial rights." *Steele* at ¶ 30, citing *State v. Long,* 53 Ohio St.2d 91, 94 (1978). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Long* at paragraph three of the syllabus.

Analysis

{¶38} In this case the State filed a motion to have R.B. deposed as a child-victim of a sexual offense pursuant to R.C. 2945.481. This motion was unopposed by Speicher and the trial court granted the motion. R.B. was then deposed on April 8, 2013, just over a month prior to his sixth birthday. At the beginning of the deposition, the trial court examined R.B. and the following dialogue ensued between the trial court and R.B.

**Q [Trial Court]: Okay. What is your name?**

**A [R.B.]: R[.]**

**Q: R[.] And what's your last name?**

**A: B[.]**

**Q: B[.] And how old are you, R[.]?**

**A: Five.**

**Q: Five. And do you know when your birthday is?**

**A: May.**

**Q: In May.**

**A: I don't know what day it is.**

**Q: Okay. And do you have any brothers or sisters?**

**A: Only have just sisters.**

**Q: Sisters. Okay. And what are their names? How many sisters do you have, first?**

A:  Three.

{¶39} Q:  Three sisters.  And what are your sisters' names?

A:  A[.], M[.], and S[.].

Q:  Okay.

A:  (INAUDIBLE).

Q:  And can you tell me where you live, please.

A:  Ohio.

Q:  Okay.  And whereabouts in Ohio, if you know?

A:  Well, [provides precise street address], London, Ohio.

Q:  Okay.  And who lives there with you?

A:  Mom, Dad, (inaudible), A[.], me, and M[.] doesn't live there.

Q:  Okay.  Now, I got Mom and Dad.  And how many of the sisters live with you?

A:  Three.

Q:  All three sisters live with you?

A:  Uh-huh.

Q:  You said somebody doesn't live there, who was that?

A:  M[.].  And I'm saying and C[.].

Q:  Okay.  And are you in school yet?

A:  I'm in kindergarten and Sunday school.

**Q: Okay. And do you know the name of the school that you go to?**

**A: Sunday school.**

**Q: Sunday school. And what about the kindergarten school, do you know the name of that?**

**A: It's home school.**

**Q: Home school. Okay. So you mom's your teacher?**

**A: Uh-huh.**

**Q: Okay.**

**A: And we home.**

**Q: Okay. And can you tell me how many fingers I'm holding up?**

**A: Three.**

**Q: Three. All right. And with – have you been telling me the truth today when I'm asking you these questions?**

**A: Uh-huh.**

**Q: Does that uh-huh mean yes?**

**A: Uh-huh.**

**Q: Okay. And do you know the difference between the – between telling the truth and telling a lie?**

**A: Uh-huh. A lie is something that isn't true.**

**Q: Okay. And --**

**A: Truth is something that was real.**

**Q: Truth is something that's real. Okay. If I told you that the sky was green, would that be telling you the truth or telling you a lie?**

**A: No. The sky really blue.**

**Q: Okay. So I would be telling you a lie if I told you that the sky was green, right?**

**A: Uh-huh.**

**Q: Okay. Is it okay to lie?**

**A: Nope.**

**Q: Okay.**

**A: A big bad thing.**

**Q: Okay. And is telling a lie good or bad then?**

**A: Bad.**

**Q: Okay. And do you understand that you could get in trouble for telling a lie?**

**A: Uh-huh. You get in trouble.**

**Q: Okay. And can you hold up your right hand and can you promise me that you'll tell the truth today?**

**A: Umm. (HOLDING UP LEFT HAND.)**

**Q: Right hand. That's left hand.**

**A: Yeah.**

**Q: Okay. And will you promise me that you'll tell the truth today?**

**A: Uh-huh.**

**Q: All right. Thank you.**

(Apr. 8, 2013, Tr. at 5-8). After the trial court's initial inquiry, the deposition proceeded.

**{¶40}** At trial, the State moved to introduce the video deposition of R.B. and the accompanying transcript of that deposition into evidence. When the State moved to introduce the exhibits, the State requested that the trial court make an affirmative finding that R.B. was competent to testify, even though Speicher still had never objected to such a finding and had never challenged R.B.'s competency. Nevertheless, the trial court made a determination that R.B. was competent to testify. The video and the deposition were admitted into evidence, again without objection by Speicher.

**{¶41}** On appeal, Speicher now contends that the trial court erred in finding R.B. competent to testify. In support, he cites *State v. Frazier*, 61 Ohio St.3d 247, 250-251 (1991), wherein the Supreme Court of Ohio determined,

> **It is the duty of the trial judge to conduct a voir dire examination of a child under ten years of age to determine the child's competency to testify. Such determination of competency is within the sound discretion of the trial judge. The trial judge has the opportunity to observe the child's appearance, his or her manner of responding to the questions, general demeanor and any indicia of ability to relate the facts accurately and truthfully. Thus, the responsibility of the trial judge is to determine through questioning whether the child of tender years is capable of**

**receiving just impressions of facts and events and to accurately relate them.**

{¶42} In *Frazier*, the Supreme Court of Ohio presented a number of factors for a trial court to take into consideration when determining whether a child under ten is competent to testify including: 1) the child's ability to receive accurate impressions of fact or to observe acts about which he will testify; 2) the child's ability to recollect those impressions or observations; 3) the child's ability to communicate what was observed; 4) the child's understanding of truth and falsity; and 5) the child's appreciation of his or her responsibility to be truthful. *Id.* at 251.

{¶43} In this case, Speicher acknowledges that a trial court is not required to make express findings on the *Frazier* factors. "Such a requirement would unduly burden our trial courts with unnecessary formality." *Schulte v. Schulte*, 71 Ohio St.3d 41, 43, 1994-Ohio-459. Despite acknowledging that a trial court need not make explicit findings on *Frazier* factors, Speicher argues that the trial court erred here by not making findings through a journal entry or by at least making statements on the record because there was no indication that the trial court actually considered the *Frazier* factors.

{¶44} In reviewing the record, however, the dialogue between the trial court and R.B. at the beginning of the deposition illustrates that the trial court was concerned with R.B.'s ability to recall facts, his ability to communicate, his understanding of truth and lies, and his appreciation for the responsibility of being

truthful. All of these are factors to be considered under *Frazier*. Given R.B.'s responses, and the trial court's ability to observe his demeanor, we do not find error in the trial court's determination that R.B. was competent to testify. Moreover, under similar circumstances, we have found that a trial court did not err in finding a five year old competent to testify. *State v. Tebelman*, 3d Dist. Putnam No. 12-09-01, 2010-Ohio-481, ¶ 24. Here, we would not be able to find the trial court's competency determination to be an abuse of discretion; however, since there was no objection to R.B.'s competency determination, we certainly cannot find plain error. Thus this argument is not well-taken.

{¶45} Finally, in the styling of his third assignment of error, Speicher states that the trial court erred by finding the child victim competent to testify *and to testify by video deposition*. This would appear to imply that Speicher was contesting the determination to allow R.B. to testify via video deposition at all. However, again this was not objected to by defense counsel. Notwithstanding this point, it is expressly permissible for a child sex offense victim to testify via video deposition and to have that deposition introduced at trial pursuant to R.C. 2945.481 so long as certain procedures are met. There is no indication in this case that the procedures were not met, and Speicher actually does not devote any argument in his brief in his third assignment of error to this issue establishing otherwise. For all of these reasons, Speicher's third assignment of error is overruled.

*Fourth Assignment of Error*

{¶46} In Speicher's fourth assignment of error, he contends that he received ineffective assistance of trial counsel. Specifically, he contends that his trial counsel was ineffective for failing to object to R.B.'s competence to testify, for failing to file a memorandum opposing R.B.'s ability to testify by video deposition, for failing to question witnesses in a manner that presented a defense for Speicher, for eliciting damaging testimony to Speicher, and for failing to present any expert testimony to refute the testimony given by the State's medical witnesses.

Standard of Review

{¶47} "To establish a claim for ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that counsel's deficient performance prejudiced him." *State v. Hernandez*, 3d Dist. Defiance Nos. 4–16–27, 28, 2017–Ohio–2797, ¶ 12, citing *State v. Phillips*, 3d Dist. Allen No. 1–15–43, 2016–Ohio–3105, ¶ 11, citing *State v. Jackson,* 107 Ohio St.3d 53, 2005–Ohio–5981, ¶ 133, citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984). The failure to make either showing defeats a claim of ineffective assistance of counsel. *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697. ("[T]here is no reason for a court deciding an ineffective assistance of counsel claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

Analysis

**{¶48}** With regard to Speicher's contention that his counsel was ineffective by failing to object to R.B.'s competence to testify and the use of his testimony via deposition, we have already found no prejudicial error thus he could not establish an ineffective counsel claim on those issues. We also cannot find that any failure to file a memorandum in opposition was prejudicial in this matter.

**{¶49}** Next, with regard to Speicher's claim that his counsel was ineffective for failing to appropriately cross-examine witnesses, this argument is pure conjecture and a matter of trial tactics. Speicher argues that trial counsel should have emphasized evidence differently or asked more questions, but it is complete speculation that any unknown question asked would have somehow led to an acquittal. We will not find ineffective counsel based on speculation. *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 52; *See also State v. Mohamed*, 151 Ohio St.3d 320, 2017-Ohio-7468, ¶ 18 ("Questionable trial strategies and tactics, however, do not rise to the level of ineffective assistance of counsel.").

**{¶50}** Speicher also argues that trial counsel was ineffective for failure to secure expert testimony in support of his case even though there is no indication that an expert existed to support his case, or as to what an expert might have stated that would change the outcome. This again relies wholly on speculation. Furthermore, the Supreme Court of Ohio has stated that "the failure to call an expert and instead

rely on cross-examination does not constitute ineffective assistance of counsel." *State v. Nicholas*, 66 Ohio St.3d 431, 436 (1993), citing *State v. Thompson*, 33 Ohio St.3d 1, 10-11 (1987). Where the record does not indicate what kind of testimony an expert witness could have provided, the issue of whether counsel was deficient in failing to secure a defense expert is "purely speculative." *State v. Madrigal*, 87 Ohio St.3d 378, 390–91; *State v. Johnson*, 8th Dist. Cuyahoga No. 105612, 2018-Ohio-1389, ¶ 71, *appeal not allowed*, 153 Ohio St.3d 1462, 2018-Ohio-3258.

{¶51} In sum, on the basis of the record before us we cannot find that Speicher has demonstrated his counsel was ineffective or that any purported ineffectiveness was prejudicial. Therefore, his fourth assignment of error is overruled.

*Conclusion*

{¶52} For the foregoing reasons Speicher's assignments of error are overruled and the judgment of the Union County Common Pleas Court is affirmed.

*Judgment Affirmed*

**PRESTON and ZIMMERMAN, J.J., concur.**

**/jlr**